UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
DETROIT, MICHIGAN

Loabat Amiri, Mohammed Amin Latif,
Farbod Latif,

               Plaintiffs,                  **Case No.**

v.

                                          **Hon.**

John Kelly, Secretary, U.S. Department of
Homeland Security; Rex W. Tillerson,
Secretary U.S. Department of State;               **COMPLAINT**
Acting Commissioner Kevin K. McAleenan,   **AND JURY DEMAND**
Customs and Border Protection; Andrew
McCabe, Director, Federal Bureau of Investigations;
Michael S. Rogers, Director, National Security
Agency; Nicholas J. Rasmussen, Director,
National Counter Terrorism Center;
Dan Coats, Director of Office of the
Director of National Intelligence,
Christopher M. Piehota, Director, Terrorist Screening
Center; unidentified FBI Agents, jointly and severally;
Unidentified TSC agents, jointly and severally,
Unidentified CBP agents, jointly and severally.

               Defendants.

_____/

**COMPLAINT AND
JURY DEMAND**

There are two resolved civil actions arising out of the same transaction or
occurrence alleged in this Complaint

1

The Plaintiffs, Loabat Amiri, Mohammad Amin Latif and Farbod Latif, by and through their attorneys, Pastor & Associates, P.C. state as follows:

## I.   INTRODUCTION

1. The federal government is depriving the Plaintiffs in this action of their Constitutional rights and in the process violating various statutes including the Immigration and Naturalization Act and the Administrative Procedures Act.

2. Using secret evidence and information, the federal government has listed people as threats to national security.   Victims of this system are not given any notice of an adverse action and are left with no recourse to challenge their designations as threats to national security by somehow being connected to terrorism.

3. Numerous publications have indicated the flaws in this system of designating persons as threats to national security on the various databases like TIDE, TECS, etc.

http://www.nytimes.com/2010/04/07/us/07watch.html

https://theintercept.com/2014/07/23/blacklisted/

https://www.wsj.com/articles/SB121937117186362585

4. The Plaintiffs are all victims of this system which have separated their family for almost 7 years and have humiliated, embarrassed and degraded the Plaintiffs without just cause.

5. The children have grown up without seeing their father for almost 7 years.

Graduations and other important events in their life have been marred since the father of the family is unable to attend any of these events.

6. Plaintiffs Amiri and Latif are in a position that has left without the emotional and financial support that is the hallmark of married couples.

7. The very structure of this family has been destroyed by the secret and unconstitutional actions of the federal government.

8. The determination that a person is somehow connected to terrorism under the INA is so vast and encompasses many forms of behavior.   Yet, the federal government does not even tell the affected person which behavior it believes makes him/her inadmissible due to terrorism.   This decision is made without even presenting evidence (in camera if necessary or a summary of the evidence that does not reveal any classified or secret information) to ensure that the executive branch is not operating unchecked on the basis of erroneous or nonexistent evidence, or in bad faith.

9. It is the secrecy surrounding this unreliable system of national security databases that has caused all the suffering of the Plaintiffs who have been left helpless and without recourse to defend themselves.

## I.      JURISDICTION

10.  This Court has jurisdiction pursuant to U.S. Const. Art. III § 2 because the

rights sought to be protected arise from the U.S. Constitution.   Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 1343, the U.S. Constitution and federal common law.

11.  Jurisdiction over the individual defendants sued in their personal capacities is authorized and instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)

12.  This Court has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

## II.   VENUE

13.  Venue is proper under 28 U.S.C. § 1391(e). Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States.   The Plaintiffs, Amiri and Farbod reside in the district and Plaintiff Latif resided in the district and will reside in this district once he is admitted to the U.S.   The acts or omissions giving rise to this action occurred in this district.

## III.   PARTIES

14.  Loabat Amiri (Amiri) is a citizen of Great Britain, a citizen and national of Iran and a permanent resident of the U.S. She resides in the county of Midland in the

State of Michigan.   She practices medicine in Michigan.   She has two U.S. citizen children.

15.  Mohammad Amin Latif (Latif) is a citizen and national of Great Britain and the spouse of Plaintiff Amiri.   He is eligible for permanent residency as a derivative of his spouse's lawful permanent resident status. He currently resides in Great Britain but the family's home is located in the county of Midland in Michigan.   He has two U.S. citizen children.

16.  Farbod Latif (Farbod) is a United States citizen by birth and is currently a student.   He is the son of Plaintiffs Amiri and Latif.   He resides in the County of Midland in the state of Michigan.

17.  John Kelly is the Secretary of the U.S. Department of Homeland Security (DHS) and is being sued in his official and personal capacity.   The U.S. Department of Homeland Security is a department of the federal government which grants benefits under the immigration laws and enforces the immigration laws and regulations.    DHS makes determinations on permanent resident applications and issues of inadmissibility; including decisions on visa denials.

18.  Rex W. Tillerson is being sued in his official and personal capacity as the U.S. Secretary of State. The Department of State (DOS) oversees the U.S. Embassies and Consulates abroad.   DOS is responsible for the issuance of immigrant and non-immigrant visas.   DOS specifically uses the Consular Lookout and Support

System (CLASS) database that contains a subset of the Terrorism Screening Database (TSDB) after interviewing an applicant for a visa.

19.  Kevin A. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection. (CBP) Kevin A. McAleenan is being sued in his official and personal capacity. CBP's responsibilities include maintaining and at times, authoring the contents of individual records in the TECS (not an acronym) database as well as the inspection and admission of persons arriving at U.S. international ports of entry which includes airports and land borders.   CBP also determines whether a traveler is admissible to the U.S. and has the authority to summarily and expeditiously remove persons from the U.S. at the ports of entry.

20.  Andrew McCabe is the Acting Director of the Federal Bureau of Investigations (FBI) He is being sued in his official and personal capacity.   The FBI is involved in the nominations that result in placement in the TECS database. The FBI also administers the Terrorism Screening Center (TSC).

21.  Michael S. Rogers is the Director of the National Security Agency (NSA). Michael S. Rogers is being sued in his official and personal capacity. The NSA collects, processes, and disseminates intelligence information from foreign electronic signals for national foreign intelligence and counterintelligence purposes and to support military operations. NSA is also tasked with preventing foreign adversaries from gaining access to classified national security

information.

22. Nicholas J. Rasmussen is the Director of the National Counter Terrorism

Center (NCTC) and is being sued in his official and personal capacity.   NCTC

produces analysis, maintains the authoritative database of known and suspected

terrorists, shares information, and conducts strategic operational planning.

23. Dan Coats is the Director of the Office of the Director of National Intelligence

(ODNI) and he is being sued in his official and personal capacity.   ODNI leads

the Intelligence Integration of the U.S. and oversees the intelligence gathering

of the various U.S. entities.

24. Christopher M. Piehota is the Director of the Terrorist Screening Center (TSC)

and is being sued in his official and personal capacity.   The TSC develops and

maintains the consolidated Terrorism Screening Database (TSD).   The TSC

also disseminates information regarding who is on the TSD to local, national

and foreign agencies.

25. Defendants Unidentified FBI Agents are employees of the FBI and are being

sued in their individual capacities.   The Unidentified FBI Agents are

responsible for providing information to the TSC and the TECS which result in

the inadmissibility determinations and designations as national security threats.

26. Defendants Unidentified TSC agents are employees of TSC and are being sued

in their individual capacities.   The Unidentified TSC agents are involved in

assembling the names of persons being placed on the TSD and then

disseminating that information worldwide.

27.  Unidentified CBP agents are employees of CBP and are being sued in their

individual capacities.   The Unidentified CBP agents are responsible for

summarily removing Plaintiff Latif from the U.S. and for maintaining the TECS

system on which Plaintiffs Amiri and Latif are identified.

## IV.   FACTS

28.  Plaintiff Latif is a citizen and national of Great Britain who is married to

Plaintiff Amiri.   They have two U.S. citizen children, one of whom is a

Plaintiff Farbod, age 20 and a daughter who currently 10 years old.   They have

not been able to live with their father since they were 13 and 4 years old.

29.  Latif holds advanced degrees from the University of Westminster and the

University of Cardiff in Great Britain.   He was continuously employed in Great

Britain until he came to the United States in 2006.   He is the recipient of many

distinctions in Great Britain such as being Freeman of London - a group that

stretches back to 1237.   The Freeman of London was organized for

businessmen and is also an honor to bestow upon the Great Britain's great and

good. Famous names to appear on the list include Jungle Book author Rudyard

Kipling and former Prime Minister Benjamin Disraeli.   Over half of million

people have been granted this honor since 1237.   As a Freeman of London, Latif was instrumental in securing two air ambulances for London hospitals. He is currently the Master of the Meridian Greenwich Lodge of Great Britain. An honor bestowed upon him by his fellow Freeman of London.     Latif is also a Livery Man of City of London. The livery companies of the City of London, currently 110 in number, comprise London's ancient and modern trade associations and guilds.   London's livery companies play a significant part in city life, not least by providing charitable-giving and networking opportunities. Liverymen retain voting rights for the senior civic offices, such as the Lord Mayor, Sheriffs and City of London Corporation, its ancient municipal authority with extensive local government powers.    Through these organizations Latif has been instrumental in raising funds for children in need and hospices, and securing instruments for hospitals.

30.  Plaintiff Amiri is a medical doctor who specializes in endocrinology.   In August 2006, Plaintiff Amiri entered the U.S. on an H-1B visa to partake in a medical residency program at Metro Health Medical Center in Cleveland, Ohio and later transferred to the Henry Ford Health Systems in Michigan.

31.  Plaintiff Latif entered on an H-4 visa shortly afterwards as a derivative of his wife, Amiri's H-1B visa.

32.  Latif's visa is annotated by the Defendant, U.S. Department of State with a

note stating that security clearances were received on October 16, 2006.

33. Amiri's visa is annotated by Defendant, U.S. Department of State with a note stating that security clearances were received on June 29, 2010.

34. Latif requested and received an H-4 extension in April 20, 2009.   When he requested the extension from Defendant DHS, Latif was fingerprinted and checked through the various databases.   Defendant DHS granted the H-4 renewal indicating Latif did not pose a security threat.

35. Amiri also extended the H-1B status.   Amiri was also fingerprinted and run through various databases by Defendant DHS prior to receiving the H-1B extension.   Obviously, she posed no security threat since she was granted a visa and subsequently the requested extension.

36. The Plaintiffs and the minor daughter traveled numerous times to Europe for visits with family and family events.   Each time the family returned to the U.S., they were checked against all security databases by Defendant CBP and each time, the family was admitted to the U.S.

37. On April 6, 2010, Latif and Amiri appeared at the U.S. Consulate in Ottawa, Canada to receive the H visas because the visas in their respective passports had expired. Even though Plaintiffs Latif and Amiri had H extensions that were valid upon leaving the U.S., they were required to have valid H visas in their passports in order to reenter the U.S.

38.  The U.S. Consulate in Ottawa, Canada told both Amiri and Latif that adjudication of the requested H visas required administrative processing that would take a few days.

39.  After waiting for two weeks with no response from the U.S. Consulate in Ottawa regarding the H visas, Latif and Amiri decided to return to the U.S. They contacted their former counsel and were instructed to return to the U.S. at which point, Latif was allowed to enter on his British passport for 90 days and Amiri was paroled into the U.S.

40.  Subsequently, the U.S. Consulate in Ottawa emailed Latif and Amiri advising them that the H visas were ready to be picked up at the Consulate.   Then almost immediately, a subsequent email was sent advising that there was an error, and Latif's visa was not ready but Amiri's visa was issued.   Amiri traveled to Ottawa and received the H-1B visa.

41.  After the 90 days had passed, Latif requested that Defendant CBP in Michigan grant him a parole to allow him to be in the U.S. with his minor children while Amiri continued the medical residency program.

42.  CBP granted Latif a parole for 30 days and agreed to continue granting him parole into the U.S. for 30 day increments.   In order to receive the parole, Latif was required to exit the U.S. and travel to Canada and then return to be paroled into the U.S.

43.  On November 25, 2010, Latif contacted Defendant CBP in Detroit, Michigan

to confirm that he would again be applying for parole on November 30, 2010.

On November 30, 2010, Latif applied to be paroled into the U.S. as he had

previously done.   On that date, Latif was denied the parole and issued an

expedited removal at the Port Huron Port of Entry.

44.  On that same date, CBP ran security checks on Latif and found a TECS record

that was created on November 25, 2010.   On that same date, a TECS record

was also created for Amiri, though Amiri had had no contact with CBP or any

other agency at that time.

45.  Latif was detained for 30 days pending removal to Great Britain. During that

time, various agencies of the Defendants were contacted but none of the

Defendants took any interest in Latif with the exception of Defendant CBP

which executed the expedited removal order on December 20, 2010.

46.  Latif has not returned to the U.S. since that date almost 7 years ago.

47.  Subsequently, Amiri's employer filed I-140 petition for alien worker to classify

her in the second preference category as a professional holding an advanced

degree. If approved, this would allow Amiri to file for permanent residency to

work permanently at the hospital.   This Petition was approved in 2012.

48.  At the same time that Amiri's employer filed the Petition, Amiri filed an

application to adjust status to permanent resident which would grant her

12

permanent residency in the U.S.   Amiri's fingerprints were again taken as part of this process.   Defendants conducted extensive background checks as part of the application process.

49.  After waiting for over a year with no response from Defendant DHS regarding the adjustment of status application, Amiri filed a mandamus action in this District. Before the government's response was due, Amiri received permanent residency.

50.  Plaintiff Latif, as a derivative of Plaintiff Amiri, was required to wait until Amiri received permanent residency to consular process his permanent residence.   Once Amiri's mandamus was settled and she received permanent residency, Latif proceeded with his derivative application for permanent residency through the DOS and the U.S. Embassy in London, England, UK.

51.  Latif was interviewed by the U.S. Embassy in London on his application for permanent residency.   His interview with the consular officer lasted only a few minutes and Latif was told his case had to go to administrative processing. Years afterwards and after numerous requests and the filing of a mandamus action in this District, the U.S. Embassy in London issued a letter stating that Latif been found ineligible to receive an immigrant visa under Section 212(a)(3)(B) of the INA.

52.  Latif requested that Defendant's DOS Legal Net service provide more

information on the determination of ineligibility for an immigrant visa. Defendant DOS declined to provide more information.

53.  Plaintiff Latif also requested that the U.S. Embassy reconsider the ineligibility determination.   To date, the U.S. Embassy in London has not issued a response to the reconsideration.

## V.    THE LEGAL FRAMEWORK

54.  H-1B Visa is a non-immigrant visa which allows U.S. employers to temporarily employ foreign professionals in specialty occupations for three years, extendable to six years.   Spouse and unmarried children under 21 years of age could apply for H-4 non-immigrant visa.   *Immigration and Nationality Act of 1990*, §101(a)(17)(H)

55.  All foreign nationals pursuing permanent residence in the U.S. based on employment fall under one of five employment-based preference categories. An approved Department of Labor certification application is a prerequisite to filing the I-140 Petition for Immigrant Worker (I-140). Once DOL approval is received, an employer files the I-140.

56.  After the I-140 is approved, the individual foreign national applies for permanent residence.   The foreign national, his/her spouse and children under 21 can either adjust status if in the U.S. or obtain an immigrant visa at a U.S. consulate abroad which is commonly referred to as consular processing.

14

57.  In the case of an adjustment of status in the U.S., the foreign national and the qualifying family members file an I-485 Application to Adjust Status with USCIS, a division of DHS.   Every applicant over the age of 12 is fingerprinted and a security check is conducted.   If any adverse information is found in this security check, the person will be found to be inadmissible and permanent residency will be not granted unless, if available, an appropriate waiver is filed with DHS.   There is no waiver for any of the terrorism related grounds.

58.  In the case of consular processing, the case is sent by DHS to DOS's National Visa Center who then forwards it to the appropriate U.S. Consulate.   Security checks are conducted and if any negative information is found, the person is determined to be inadmissible and the U.S. Consulate will request that the applicant file a waiver.   No waiver exists for any of the terrorism grounds of inadmissibility.

59.  Prior to the Immigration Act of 1990 (P.L. 101-649), there was no express terrorism-related ground for inadmissibility. Congress added the terrorism ground in the 1990 Act as part of a broader effort to streamline and modernize the security and foreign policy grounds for inadmissibility and removal.

60.  The REAL ID Act (P.L. 109-13, Division B May 11, 2005) (REAL ID Act) expanded the terror-related grounds for exclusion and removal, and amended the definitions of "terrorist organization" and "engage in terrorist activity" used

by the INA.

61.  Terrorism-related inadmissibility grounds (TRIG), exclude persons who have participated in various kinds of activity. The grounds for inadmissibility include, but are not limited to, individuals who have engaged in terrorist activity, are engaged or are likely to engage in terrorist activity after entry, incited terrorist activity with intent to cause serious bodily harm or death, are representatives or current members of a terrorist organization, endorsed or espoused terrorist activity, received military-type training from or on behalf of a terrorist organization, or are spouses or children of anyone who has engaged in terrorist activity within the last five years (with certain exceptions).

62.  "Terrorist activity" is defined by INA § 212(a) (3) (B) (iii). In order for an action to constitute "terrorist activity," it must have been unlawful in the place where it was committed (or, if it would have occurred in the United States, have been unlawful under U.S. law) and involve one or more of the following:

• the hijacking or sabotage of an aircraft, vessel, or other vehicle;

• seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained;

• a violent attack upon an internationally protected person (e.g., Head of State,

Foreign Minister, or ambassador);

• an assassination;

• the use of any biological agent, chemical agent, or nuclear weapon or device;

• the use of any explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; or

• a threat, attempt, or conspiracy to commit any of the foregoing.

63. The INA treats being "engaged in terrorist activity" as a separate concept from "terrorist activity" itself. The REAL ID Act amended the definition of "engage in terrorist activity" to cover more indirect forms of support for non-designated terrorist organizations. In order to "engage in terrorist activity," an alien must, either in an individual capacity or as part of an organization engage in one or more of the following:

• commit or incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

• prepare or plan a terrorist activity;

• gather information on potential targets for terrorist activity;

• solicit funds or other things of value for (1) terrorist activity, (2) a designated terrorist organization (i.e., a Tier I or Tier II organization), or (3) a non-designated

terrorist organization (i.e., a Tier III organization), unless the solicitor can prove by clear and convincing evidence that he did not know, and should not have reasonably known, that the organization was a terrorist organization;

• solicit another individual to (1) engage in terrorist activity, (2) join a designated terrorist organization, or (3) join a non-designated terrorist organization, unless the solicitor can prove by clear and convincing evidence that he did not know, and should not have reasonably known, that the organization was a terrorist organization; or

• commit an act that the individual knows, or reasonably should know, provides material support to (1) the commission of a terrorist activity, (2) an individual or organization that the individual knows or should reasonably know has committed or plans to commit a terrorist activity, (3) a designated terrorist organization or member of such an organization, or (4) a non-designated terrorist organization or a member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

64. Engaging in specified, terrorism-related activity has direct consequences concerning an alien's ability to lawfully enter or remain in the United States. The INA provides that aliens engaged in terrorism-related activities generally cannot legally enter the United States. If an alien is legally admitted into the

United States and subsequently engages in terrorist activity, he is removable.

65.  Personal interviews are required for all prospective legal permanent residents. Consular officers use the Consular Consolidated Database (CCD) to screen visa applicants. In addition to indicating the outcome of any prior visa application of the alien in the CCD, the system links with other databases to flag problems that may affect the issuance of the visa. The CCD is the nexus for screening aliens for admissibility, notably screening on terrorist, security and criminal grounds.

66.  The Administrative Procedures Act (APA) § 3 addresses the procedural formalities that agencies must employ when making decisions. 5 USC § 552 §3. The APA stands as a bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated by federal government agencies.   In order to protect citizens, the APA also grants the judiciary oversight over all agency actions.

## VI.   COUNT 1 – VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION (FREE EXERCISE)

67.  Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

68.  The Establishment Clause of the First Amendment prohibits the Federal Government from officially preferring one religion over another.

69. The Defendants' TECS designation of Plaintiffs Amiri and Latif violates the Establishment Clause because it is based on an imputed religious belief – Islam.

70.  The inadmissibility determination by Defendants discriminates against Plaintiffs because it is based on TECS, TSD and other systems which contained the unsubstantiated information based on the Plaintiffs' imputed religious beliefs – Islam.

71.  There is no substantial justification for finding that the Plaintiffs are in any way associated with terrorism.   Rather, the Defendants engaged in the unconstitutional practice of profiling to make both the TECS designation and the finding of inadmissibility.   These findings were based on the Defendants' belief that the Plaintiffs are Muslims and therefore must be associated with terrorism.

72.  Defendants violated Plaintiffs' freedom of religion in that, Plaintiffs are erroneously believed to be connected to terrorism and are targeted based on their religious beliefs or appearance of a certain religious belief.

73.  As a direct and proximate cause of the Defendants' unlawful religious profiling, the Plaintiffs were harmed and suffered violations of their first amendment rights not to have an established religion or to have their freedom of religious exercise abridged.

74.  Through their actions described in this Complaint, Defendants have violated the Establishment Clause and the Free Exercise Clause. Defendants' violation inflicts ongoing harm upon all of the Plaintiffs.

75.  Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## VII.   COUNT 2 – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FIFTH AMENDMENT

76.  Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

77.  The Fifth Amendment prohibits the Federal Government from denying equal protection of the laws, including on the basis of religion and/or national origin, nationality, or alienage.

78.  The TECS designation violates Equal Protection because it is based on national origin and imputed religious belief.   Plaintiff Amiri was born in Iran and is an Iranian citizen and Plaintiff Latif resided in Iran during his youth.   Further, upon information and belief, the Defendants have imputed that the Plaintiffs are Muslims.

79.  As a direct and proximate result of the Defendants' actions, the Plaintiffs suffered a lack of equal protection afforded to them by the U.S. Constitution.

80.  Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants

21

acted with an improper motive amounting to malice and with conscious

disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive

damages from Defendants in an amount according to proof at the time of trial.

## VIII.  COUNT 3 – VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (FAILURE TO PROVIDE PRE DEPRIVATION AND POST DEPRIVATION NOTICE AND HEARING)

81. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

82.  The Due Process Clause establishes a minimum level of procedural protection

before those liberty interests can be deprived. A non-citizen must be given an

opportunity to present her case effectively, which includes a hearing and some

consideration of individual circumstances.

83.  Plaintiffs Amiri and Latif learned of the TECS designation after the

designation was made by the Defendants.

84. Plaintiff Latif learned of the basis for his inadmissibility after the determination

was made that he was subject to INA 212(a) (3) (b).

85.  In refusing to provide Plaintiffs Amiri and Latif with any prior notice, the

Defendants deprived Plaintiffs Amiri and Latif of their constitutional rights.

86.  By failing to provide Plaintiffs Amiri and Latif with post TECS and 212(a) (3)

(b) designation notice with a right to contest the designations, the Defendants

violated the Plaintiffs' constitutionally protected rights.

87.  The Defendants in placing Plaintiff Latif in a category of INA 212(a) (3) (b) on the basis of undisclosed information without informing him of such designation, the basis for the designation, or providing an independent forum in which Plaintiff Latif might secure the removal of this designation and be reunited with his family violated his right to procedural due process under the Fifth Amendment. *Amadou v. INS*, 226 F.3d 724, 726-27 (6th Cir. 2000) (noting that noncitizens have "due process right to a full and fair hearing")

88.  As a direct and proximate cause of Defendants' actions, Plaintiffs Amiri and Latif have suffered the deprivation of constitutionally protected procedural due process rights.

89.  Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## IX.   COUNT 4 – VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT BY INFRINGING ON THE RIGHT TO TRAVEL.

90.  Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

91. The right to international travel is a protected right under the Fifth Amendment.

92. The Plaintiffs are unable to travel internationally because of the TECS designation placed on Amiri and Latif and the inadmissibility determination placed on Latif.

93. Defendants, in committing the acts herein alleged, were acting under color of law.

94. Defendants were acting in accordance with their custom, policy and/or practice in violating Plaintiffs' constitutional rights as set forth above.

95. As a direct and proximate cause of Defendants' actions, the Plaintiffs have suffered harm to their reputation and denied legal rights accorded to them by the U.S. Constitution.

96. Plaintiffs Amiri and Latif have been stigmatized as security risks with ties to terrorism without being allowed the opportunity to contest the determination.

97. Plaintiff Farbod has suffered emotional stress and other damages by having his parents designated as persons who are threats to national security.

98. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious

disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## X.   COUNT 5 – VIOLATION OF ARTICLE 1 SECTION 9 OF THE U.S. CONSTITUTION (BILL OF ATTAINDER)

99.  Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

100. The U.S. Constitution Art.1 Sec. 9 prohibits the government from singling out someone for punishment without a trial.   This is known as a Bill of Attainder.

101.  A bill of attainder has three specific prongs: 1) specifically identified the people to be punished; 2) imposed punishment; and 3) did so without benefit of judicial trial. *United States v. Lovett*, 328 U.S. 303 (1946)

102. The Defendants actions have identified the Plaintiffs, imposed punishment on them, to wit:   stigmatized them as terrorists or supporting terrorists and limiting their travel, and have done so without benefit of a judicial trial.

103.  As a proximate and direct cause of Defendants' actions, the Plaintiffs' have suffered stigmatization, inability to freely travel and family separation.

104.  Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## XI.   COUNT 6 – VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT OF 1965 (DISCRIMINATION BASED ON NATIONALITY)

105. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

106. The INA of 1965 forbids discrimination in issuance of visas based on a person's race, nationality, place of birth, or place of residence. 8 U.S.C. § 1152(a)(1)(A)

107. The INA of 1965 (also known as the Hart-Cellar Act) banned all discrimination against immigrants on the basis of national origin, thereby abolishing the old prejudicial and harsh visa issuance system and giving each country an equal shot at the quotas.

108. The Hart-Celler Act abolished the national origins quota system that had structured American immigration policy since the 1920s, replacing it with a preference system that focused on immigrants' skills and family relationships. Numerical restrictions on visas were set at 170,000 per year, not including immediate relatives of U.S. citizens, nor "special immigrants" (including those born in "independent" nations in the Western hemisphere; former citizens; ministers; employees of the U.S. government abroad). H.R. 2580; Pub.L. 89-236; 79 Stat. 911, 89th Congress; October 3, 1965.

109. When Congress passed the INA of 1965, it wished to protect not just immigrants, but also American citizens, who should have the right to sponsor

their family members or to marry a foreign-born spouse without being subject to pointless discrimination.

110. As a direct and proximate cause of the Defendants' discriminatory conduct, the Plaintiffs have suffered prolonged separation from immediate family and other treatment based solely on their nationality and perceived religion in direct contravention of the INA.

111. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.


## XII.   COUNT 7 – VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT OF 1965 (FAMILY UNITY)

112. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

113. Our immigration policy was adopted in a way that Congress thought would best bring families together. The Immigration and Naturalization Act (INA) sections that address family immigration are comprehensive.

114. Spouses of U.S. citizens have immediate visas available to them to preserve the sanctity of marriage.   8 U.S.C.§1151(b)(2)(A)(i)

115. Immediate relatives are not subject to any of the numerical limits that are placed on other family members which means they can join their family in the U.S. in the time it takes DHS and DOS to process the petitions and applications. 8 U.S.C. § 1151(b) (2) (A) (i) Immediate relatives include spouses, parents and children under 21 of U.S. citizens.

116. Furthermore, INA section 101(b) (1) (D) allows a "child" born out of wedlock to seek immediate relative status so that the child may live with his/her parent.

117. Pursuant to INA 203(d) , and whether or not named in the petition, the child or spouse of an employment-based immigrant, is entitled to a derivative status corresponding to the classification and priority date of the beneficiary of the petition.

118. Despite all of the INA's provisions on family unification, the Defendants have prevented this family from being united in violation of the INA's provisions.

119. The Defendants' actions and/or omissions are not in accordance with the law as stated in the INA.   These actions and/or omissions were done with the intent to prevent this family from being united.

120. Defendants have exceeded their statutory authority and failed to vindicate statutory rights guaranteed by the INA.

121. As a direct and proximate cause of the Defendants' violations of the INA, the Plaintiffs have suffered deprivations of their constitutional rights including

prolonged separation from immediate relatives.

122. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## XIII.  COUNT 8 – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

123. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

124. The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2) (A)-(C).

125. Defendants' actions in preventing Plaintiffs' travel into the United States were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of APA § 706(2) (A); contrary to constitutional right, power, privilege, or immunity, in violation of APA § 706(2) (B); in excess of statutory jurisdiction, authority or limitations, or short of statutory right, in violation of APA § 706(2) (C); and without observance of procedure required

by law, in violation of §706(2) (D).

126. The Defendants' actions and/or omissions are not in accordance with the law as stated in the INA and therefore in violation of the APA. 5 U.S.C. 706(2) (A) (1988). The interpretation and application of the TECS determination and the failure to issue an immigrant visa is done so as to discriminate on the basis of the Plaintiffs' nationality and perceived religion in violation of the Act, and therefore not in accordance with law.

127. Defendants have exceeded their statutory authority, engaged in nationality- and religion-based discrimination, and failed to vindicate statutory rights guaranteed by the INA.

128. As a direct and proximate cause of the Defendants' violations of the APA, the Plaintiffs have suffered deprivations of their constitutional rights including prolonged separation from immediate relatives.

129. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## XIV.  COUNT 9 – VIOLATION OF THE CONFRONTATION CLAUSE OF THE FIFTH AND SIXTH AMENDMENT TO THE U.S. CONSTITUTION

130. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

131. The Constitutional rights of confrontation and cross examination apply in all types of cases where administrative and regulatory actions are under scrutiny. The Plaintiffs' have the right to see the evidence against them and rebut that evidence. U.S. Const. Amends. 5, 6.

132. Despite repeated requests, the Defendants have failed to provide any information including unclassified information or a summary of information regarding the ineligibility determination based on terrorism grounds.

133. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive damages from Defendants in an amount according to proof at the time of trial.

## XV.  COUNT 10 – VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

134. Plaintiffs adopt and reallege all foregoing allegations as if stated herein.

135. Substantive due process encapsulates the Supreme Court's notion that the Due

Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests."

136. The Plaintiff, Latif has suffered a "change in legal status"—he is legally barred from traveling to or from the United States, which he would do had he not been subjected to the inadmissibility and TECS designation.

137. The denial of Plaintiff Latif's ability to travel to the United States to be with family constitutes an unconstitutional denial of the fundamental right to familial association.

138. The denial of Plaintiff Amiri's ability to reside with her husband in the country in which she has made a life for herself constitutes a denial of the right to familial association.

139. The denial of Plaintiff Farbod's ability to reside with his father in the country of which he is a citizen, to wit, the USA, constitutes a denial of the right to familial association.

140. The Plaintiffs' damages are a direct and proximate cause of the Defendants' actions.

141. Defendants committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring Plaintiffs. Defendants acted with an improper motive amounting to malice and with conscious disregard of Plaintiffs' rights. As such, Plaintiffs are entitled to recover punitive

damages from Defendants in an amount according to proof at the time of trial.

## XVII.   RELIEF REQUESTED

A.   Order the Defendants to provide the reason or an explanation of Latif's inadmissibility determination at a minimum in camera or in a summary.

B. Order the Defendants to provide both Plaintiffs Latif and Amiri the explanation for the TECS designation at a minimum in camera or in a summary.

C. Order the Defendants to provide the Plaintiffs with the agency and person responsible for making the inadmissibility determination and the TECS reports at a minimum in camera or in a summary.

D. Order Defendants DOS and DHS to process application if evidence is lacking or determinations are made in bad faith.

E.  Grant actual damages to all the Plaintiffs.

F.  Grant punitive damages to all the Plaintiffs.

G. Grant attorney's fees.

H. Grant such other relief at law and in equity as justice requires.

Respectfully submitted:                              Dated: July 5, 2017

____s/Caridad Pastor Cardinale_____
Caridad Pastor Cardinale (P43551)
Pastor & Associates, P.C.
525 E. Big Beaver Road Suite 206
Troy, Michigan 48083
(248) 619-0065
carrie@pastorandassociates.com