UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


Loabat Amiri, Mohammed Amin Latif,
Farbod Latif,

        Plaintiffs,                        Case No. 17-cv-12188

v.

ing LemoJohn Kelly, Secretary, U.S. Department       Hon.  Thomas  L.
John Kelly, Secretary, U.S. Department          Hon. Thomas L. Ludington
of Homeland Security, in his official            Mag. Judge Patricia T. Morris
capacity; Rex W. Tillerson, Secretary
U.S. Department of State, in his official
Capacity; Acting Commissioner Kevin K.
McAleenan, Customs and Border Protection,
in his official capacity; Andrew McCabe,
Director, Federal Bureau of Investigations,
in his official capacity; Michael S. Rogers,
Director, National Security Agency, in
his official capacity; Nicholas J. Rasmussen,
Director, National Counter Terrorism Center,
in his official capacity; Dan Coats, Director of
Office of the Director of National Intelligence,
in his official capacity; Christopher M. Piehota,
Director, Terrorist Screening Center, in his
official capacity; Unidentified FBI Agents,
jointly and severally; Unidentified TSC agents,
jointly and severally, Unidentified CBP agents,
jointly and severally.

Defendants.
_____/


# ORDER GRANTING MOTION TO DISMISS IN PART AND DIRECTING SUPPLEMENTAL BRIEFING


      On October 5, 2017, Plaintiffs Loabat Amiri (Amiri), her husband Mohamed Amin Latif

(Latif), and their son Farbod Latif (Farbod), filed an amended complaint challenging the denial

of Latif's visa, and challenging Amiri and Latif's placement on a terrorist watch list. ECF No. 1. The amended complaint contains ten counts, alleging violations of the Immigration and Nationality Act of 1965 (INA), the Administrative Procedure Act (APA), and various constitutional provisions including Article 1 section 9 (Bill of Attainder) as well as amendments 1 (free exercise), 5 (equal protection, due process) and 6 (confrontation clause). The amended complaint names 9 official capacity defendants who are the heads of various executive departments and agencies including the Department of Homeland Security (DHS), the Department of State (DOS), Customs and Border Protection (CBP), Federal Bureau of Investigation (FBI), National Security Agency (NSA), National Counterterrorist Center (NCTC), Office of the Director of National Intelligence (ODNI), and the Terrorist Screening Center (TSC). The amended complaint also names unidentified agents of the FBI, TSC, and CBP. Defendants moved to dismiss the amended complaint on October 19, 2017. ECF No. 20.

## I.

### A.

Plaintiff Dr. Loabat Amiri (Amiri) is an endocrinologist currently residing in Midland, Michigan. She is a permanent resident of the United States. She is also a citizen of Great Britain and a citizen and national of Iran. She is married to Plaintiff Mohammad Amin Latif (Latif), who is a citizen and national of Great Britain, where he currently resides. Plaintiff Latif has been designated as a Freeman of London, a Master of the Meridian Greenwich Lodge, and a Livery Man of the City of London. Amiri and Latif have a 20 year old son, Plaintiff Farbod Latif (Farbod), who is a United States citizen by birth currently residing in Midland. They also have a 10-year old daughter.

In August 2006, Amiri entered the U.S. on an H-1B visa for a medical residency at Metro Health Medical Center in Cleveland, Ohio. An H-1B is a visa issued to non-immigrants coming to the U.S. temporarily to perform work in specialized fields. She later transferred to the Henry Ford Health System in Michigan. Amiri's family entered the U.S. under H-4 visas, issued to immediate family members of H-1B visa holders. In early 2009 they requested and received visa extensions and were fingerprinted and checked through various databases. Plaintiffs periodically travelled to and from Europe without incident.

On April 6, 2010, Latif and Amiri appeared at the U.S. Consulate in Ottawa to receive their H visas, because the visas in their respective passports had expired. Am. Compl. at 10, ECF No. 19. Latif was ultimately granted entry into the U.S. on his British Passport for 90 days and Amiri was paroled into the U.S. *Id.* at 11. They requested new visas. Amiri was issued a new visa but Latif was not. Latif applied for parole with CBP, and was granted a 30 day parole. In order to receive the parole, Latif was required to exit the U.S. and travel to Canada, then return to the U.S.

On November 30, 2010, Latif applied for a new 30-day parole. CBP ran security checks and located a record for Latif and Amiri on TECS, a database used by the CBP for border and port of entry screening. Latif's parole request was denied, and he was issued an expedited removal at the Port Huron Port of Entry. Latif was detained for 30 days pending removal to Great Britain. Latif has not returned to the U.S. since that date. Amiri's employer filed an I-140 petition for Amiri as an alien professional with an advanced degree, which would allow her to gain permanent residency. Amiri filed an application to adjust her status to permanent residency. After one year with no response from DHS regarding the status of her application, Amiri filed a mandamus action in this District, after which DHS granted her permanent residency.

After Amiri was granted permanent residency, Latif submitted a derivative application for permanent residency through the DOS and the U.S. Embassy in London. He was interviewed by a consular official at the U.S. Embassy in London who determined that his application would need administrative processing. Years later, after several follow up inquiries and the filing of a mandamus action in this District, Latif received a letter from the U.S. Embassy in London stating that Latif was found ineligible for an immigrant visa under section 212(a)(3)(B) of the INA, a broad section covering terrorist activities, codified at 8 U.S.C. § 1182(a)(3)(B). Latif requested additional information through DOS Legal Net service, but no additional information was provided. He also requested reconsideration from the U.S. Embassy in London, but has not received a response. Plaintiffs then commenced this action on July 5, 2017.

## B.

### i)

A helpful exposition of the visa application procedure was provided by the court in *Ibrahim*:

> A visa is permission for an alien, also known as a foreign national, to approach the borders of the United States and ask to enter. There are several types of visas, based primarily on the purpose of the alien's travel to the United States. The procedure for obtaining a visa is as follows. *First,* the alien applies for a visa by submitting a visa application to a consular officer. The consular officer then evaluates whether the individual is eligible for a visa and what type of visa he or she may be eligible to receive. *Second,* the applicant makes an appointment for a visa interview with a consular officer at the United States embassy or a consulate abroad. Consular officers are employees of the Department of State who are authorized to adjudicate visa applications overseas. *Third,* an interview is conducted. *Fourth,* after the interview, the consular officer grants or denies the application. Consular officers are required to refuse a visa application if the alien has failed to demonstrate eligibility for the visa under the Immigration and Nationality Act, including under 8 U.S.C. 1182.

*Ibrahim v. Dep't of Homeland Sec.*, 62 F. Supp. 3d 909, 920 (N.D. Cal. 2014).

**ii)**

In making their determinations, consular officers draw upon information contained in various terrorist watch lists. The federal government maintains a unified system of watch lists to identify and list known or suspected terrorists. At the heart of this system is a centralized database known as the Terrorist Screening Database (TSDB). CONG. RES. SERV. REP., THE TERRORIST SCREENING DATABASE AND PREVENTING TERRORIST TRAVEL, https://fas.org/sgp/crs/terror/R44678.pdf (last visited Jan. 11, 2018). It is managed by the Terrorist Screening Center (TSC), a multi-agency organization administered by the FBI. *Id.*

The NCTC's Terrorist Identities Datamart Environment (TIDE) is the "central repository of the U.S. Government containing derogatory information about suspected international terrorists." CONG. RES. SERV. REP, TERRORIST DATABASES AND THE NO FLY LIST: PROCEDURAL DUE PROCESS AND HURDLES TO LITIGATION at 2, https://fas.org/sgp/crs/homesec/R43730.pdf (last visited Jan. 15, 2018). Agencies within the intelligence community (IC) evaluate intelligence information, nominate individuals suspected of terrorism, and forward the information to the NCTC.[1] *Id.* Before they can be added to the TSDB, nominees are then vetted by analysts at the NCTC, and finally undergo verification at the TSC. *Id.* at 2. "In contrast to TIDE (operated by NCTC), the TSDB (operated by TSC) does not include 'derogatory intelligence information.' Instead, it consists of 'sensitive but unclassified terrorist identity information consisting of biographic identifying information such as name or date of birth or biometric information such as photographs, iris scans, and fingerprints." *Id.* at 2–3 (quoting *Mohamed v. Holder*, 995 F. Supp. 2d 520, 526 n.8 (E.D. Va. 2014)).

---

[1] As of December 2013, according to the NCTC, about 1.1 million persons were included in TIDE, and about 25,000 were U.S. persons (citizens and lawful permanent residents). TIDE contains all of the government's information regarding persons "known or appropriately suspected to be or to have been involved in activities constituting, in preparation for, in aid of, or related to terrorism (with the exception of purely domestic terrorism information)." Due to the national security importance of this information, the contents of the database are classified. *Id.*

To be entered in the TSDB, nominees must 1) meet the "reasonable suspicion watchlisting standard" and 2) have sufficient identifiers.[2] CONG. RES. SERV. REP., THE TERRORIST SCREENING DATABASE at 5. Data from the TSDB is then exported to individual screening databases maintained by screening agencies. The data is tailored to the particular agency or departments' legal authority and mission. *Id* at 7. These include the TECS (not an acronym) system used by the CBP for border and port of entry screening; the No Fly List and Selectee List used by the TSA for airline passenger screening; the Consular Lookout and Support System (CLASS) used by the DOS for visa and passport screening; and the National Crime Information Center (NCIC) used by the FBI for domestic law enforcement screening. *Id.* at 7–9. Screeners at these agencies check the identity of the individuals they encounter. This screening process may occur in person at ports of entry, or via written forms such as visa applications.

When a query produces a match to the agency's database, this is known as an "encounter" *Id.* at 9. The officers at individual screening agencies such as the CBP only have access to limited identifying information available in the TSDB. *Id.* at 10. Thus, when a query produces an "encounter", the officer is directed to call the TSC 24-hour operations center for further inquiry. *Id.* at 10. TSC analysts then search through additional datasets and intelligence available only to them, and confirm or deny the possible match. *Id.* If a positive match is made or if the analysis is inconclusive, the FBI's Terrorist Screening Operations Unit then coordinates how the government will respond, such as by deploying agents to interview or possibly apprehend the subject. *Id.*

CBP inspectors use the TECS system that draws upon information from the TSDB to perform background checks and admissibility reviews at ports of entry. *Id.* at 12. TECS accepts

_____

[2] From FY2009 to FY2013, approximately 1.6 million individuals were nominated to the TSDB and only about 1% (roughly 14,000) were rejected. CONG. RES. SERV. REP., THE TERRORIST SCREENING DATABASE at 6.

"nearly all" records from the TSDB. *Id.* at 8. The DOS uses the CLASS system which also draws from the TSDB to perform background checks and screen all visa applicants. *Id.* The DOS also uses the Consular Consolidated Database (CCD) to maintain biometric and biographic information on visa applicants, who must submit to physical evaluations. A digital photograph and a 10-finger scan are the standard biometric data collected by U.S. Embassies and Consulates. *Id.* at 12.

DOS also relies on the Security Advisory Opinion (SAO) system. Under the SAO system, consular officers abroad must refer selected visa cases for greater review by Washington-based intelligence and law enforcement agencies. *Id.* Under the current interagency review procedures, known as Visa Viper and Visa Condor, "if consular officials receive information about a foreign national that causes concern," they send the information either to the NCTC or FBI for review. *Id.* at 13. After interagency review, a SAO is issued to the consular officer who then decides whether to issue or refuse the visa application. *Ibrahim*, 62 F. Supp. 3d at 920.

## II.

## A.

Plaintiffs challenge the denial of Latif's immigrant visa application by the consular official at the U.S. Embassy in London, and the fact that Amiri and Latif are listed in the TECS database and TSDB.

In count 1, Plaintiffs allege that Defendants violated the First Amendment free exercise and establishment clauses. They allege that "TECS, TSD[B], and other systems" contain "unsubstantiated information based on the Plaintiffs' imputed religious beliefs – Islam," and not any connection to terrorism. Am. Compl. at ¶ 68–70. Plaintiffs allege that the inadmissibility

determination also discriminates in that it was made in reliance on TECS and other systems which contained the unsubstantiated information. *Id.* at ¶ 69. Thus, Plaintiffs contend that "Defendants engaged in the unconstitutional practice of profiling to make both the TECS designation and the finding of inadmissibility." *Id.* at ¶ 70.

Count 2 alleges that Defendants violated the equal protection clause of the Fifth Amendment because the TECS designation is based on Plaintiffs' Iranian national origin and imputed religious beliefs. *Id.* at ¶ 77.

Count 3 alleges that Defendants violated Plaintiffs' Fifth Amendment procedural due process rights. Plaintiffs allege they were deprived of a constitutionally protected liberty interest by being designated on TECS and by Latif being determined inadmissible. *Id.* at ¶ 81–86. They also allege that they were not afforded the proper procedural protections, which include a pre-deprivation and post deprivation hearing. Specifically, they contend they should have been notified of the TECS designation and inadmissibility determination, the factual basis for these actions, and afforded a reasonable opportunity to contest the factual basis. *Id.* at ¶ 85–86. Count 4 alleges that Defendants violated Plaintiffs' Fifth Amendment substantive due process rights by infringing on the right to international travel: "The Plaintiffs are unable to travel internationally because of the TECS designation placed on Amiri and Latif and the inadmissibility determination placed on Latif." *Id.* at ¶ 91. Plaintiffs also allege they have suffered stigma as a result of being associated with terrorism.

Count 5 alleges that Defendants violated Article I Section 9's prohibition on bills of attainder because they singled out Plaintiffs and "stigmatized them as terrorists or supporting terrorists and limiting their travel" thereby punishing them "without the benefit of judicial trial." *Id.* at ¶ 99–101.

Count 6 alleges that Defendants violated the INA § 1152(a)(1)(A) by discriminating in visa issuance based on nationality. *Id.* at ¶ 105. Count 7 alleges Defendants violated INA § 1151(b)(2)(A)(i) by failing to vindicate Plaintiffs' statutory right to family unity. *Id.* at ¶ 111–121.

Count 8 alleges that Defendants violated the APA because the inadmissibility and TECS determinations discriminated based on nationality and imputed religion. *Id.* at ¶ 125. Thus, Plaintiffs contend that:

> Defendants' actions in preventing Plaintiffs' travel into the United States were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of APA § 706(2) (A); contrary to constitutional right, power, privilege, or immunity, in violation of APA § 706(2) (B); in excess of statutory jurisdiction, authority or limitations, or short of statutory right, in violation of APA § 706(2) (C); and without observance of procedure required by law, in violation of §706(2) (D)

*Id.* at ¶ 124.

Count 9 alleges that Defendants violated the confrontation clauses of the fifth and sixth amendments by failing to provide Plaintiffs with the evidence against them or give them a chance to rebut it. *Id.* at ¶ 129–132.

Count 10 alleges Defendants violated the Fifth Amendment substantive due process clause by denying Plaintiffs the right to familial association. *Id.* at ¶ 133–140.

Plaintiffs request that the Court order Defendants to: a) provide an explanation for the inadmissibility determination; b) provide an explanation for the TECS designation; c) provide the Plaintiffs with the agency and person responsible for making these determinations; d) "to process application if evidence is lacking or determinations are made in bad faith." Plaintiffs also seek actual damages, punitive damages, and attorney fees. *Id.* at 33–34.

**B.**

In their motion to dismiss, Defendants raise three primary arguments. First, Defendants argue that the doctrine of consular non-reviewability precludes the Court from reviewing the consular officers' decision to deny Latif's visa because 1) the consular officer's citation to 8 U.S.C. § 1182 (a)(3)(B) (terrorist activities) constitutes a facially legitimate, bonafide justification for a visa denial under *Din*, and 2) Plaintiffs have not alleged with particularity that the consular officer's decision was made in bad faith. Mot. Dismiss at 5–7.

Second, Defendants argue that Plaintiffs lack standing to challenge the denial of the visa. Defendants contend that Latif lacks standing because an unadmitted, nonresident alien has no constitutional right to enter the U.S.. *Id.* at 8. Defendants contend Amiri lacks standing because the denial of Latif's visa application did not deprive her of a constitutionally protected liberty interest. Defendants explain that the visa denial did not infringe on her right to marry and that she has no constitutional right to have her spouse present in this country. *Id.* at 9. Defendants contend the same reasoning should apply to an adult child seeking review of the denial of a visa. *Id.*

Third, Defendants assert that Plaintiffs have failed to state a claim for a constitutional or statutory violation. Specifically, Defendants contend Plaintiffs fail to state a claim under the APA (count 8) because the only final agency action challenged is the visa denial which is barred by consular non-reviewability. *Id.* at 16–17. Defendants contend Plaintiffs' claims under the first and fifth amendments (Counts 1, 2, 3, 4, 10) fail to state a claim because Plaintiffs have not pled with particularity: that they were prevented from freely exercising their religion (count 1); that they were treated differently than others similarly situated (count 2); that they were deprived of any constitutionally protected liberty interest (count 3, 4, 10); or that they have been denied the

right to travel anywhere but the United States (count 4). *Id.* at 13, 17–22. Defendants argue that the sixth amendment confrontation clause claim (count 6) is inapplicable as Plaintiffs are not criminal defendants.

Defendants also contend that Plaintiffs fail to allege any violations of the INA (Counts 6 and 7) because the INA's purported goal of family unity does not give rise to any legal rights or obligations. *Id.* at 23. Defendants assert that the bill of attainder (count 5) is inapplicable because no legislative action is at issue. *Id.* Finally, Defendants note that the amended complaint withdrew Plaintiffs' Bivens claims, and Defendants assert that Plaintiffs have identified no other basis to recover monetary damages. *Id.* at 24.

### III.

Four issues must be addressed: 1) whether the doctrine of consular non-reviewability bars the Court from reviewing the visa denial; 2) whether Plaintiffs have standing to pursue their claims; 3) whether Plaintiff Latif has a right to assert constitutional or statutory claims; 4) whether Plaintiffs have stated a claim for constitutional or statutory violations; 5) whether Plaintiffs were required to exhaust administrative remedies by availing themselves of the DHS Traveler Redress Inquiry Program (TRIP) prior to initiating this case.

### A.

#### i)

The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (citing *Fiallo v. Bell*, 430 U.S. 787 (1977)). Congress has plenary power to make rules circumscribing the conditions under which aliens may enter our country. *Kleindienst v. Mandel*,

408 U.S. 753 (1972). When congress delegates this plenary power to the Executive Branch, as it did in the case of visa processing, the decisions of the Executive Branch are also largely immune from judicial review. *Id.*

A limited exception to the doctrine of consular non-reviewability exists where the denial of a visa implicates the constitutional rights of America citizens. *Cardenas*, 826 F.3d at 1169. This exception traces its roots to the seminal case of *Kleindienst v. Mandel*, 408 U.S. 753 (1972). *Mandel* was a Belgian journalist invited to speak at several American Universities. Joined by several Professors who invited him to speak, *Mandel* brought an action to compel the Attorney General to grant him a temporary non-immigrant visa after he was found ineligible under the INA section 212(a)(28)(D) which barred those who advocate communism. *Id.* at 753. The Court noted that "Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise." *Id.* at 762. The Court found, however, that the denial of the visa implicated the first amendment rights of the Professors. *Id* at 765.

This did not end the inquiry, as the Court then articulated the circumstances under which the denial of a visa could be challenged. The Court noted that Congress had delegated to the Executive Branch its plenary power to exclude aliens and prescribe the conditions for their entry into the U.S. *Id.* at 766. The Court held that "when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look beyond the exercise of that discretion, nor test it by balancing its justification against the First Amendment interest of those who seek personal communication with the applicant." *Id.* at 770.

In 2015, the Supreme Court further elaborated on this doctrine in *Kerry v. Din,* 135 S. Ct. 2128 (2015). In *Din*, a U.S. Citizen brought a due process challenge to the adequacy of the

reasoning offered by a consular official in denying the visa application of her husband, a citizen of Afghanistan. The consular official had informed her that her husband was inadmissible based on the "terrorist activities" bar of INA section 1182(a)(3)(B). *Id.* at 2129. The district court dismissed the action based on consular nonreviewability, and the Ninth Circuit reversed. The Supreme Court reversed and remanded. Writing for the plurality, Justice Scalia concluded that, "to the extent she received any explanation for the Government's decision, this was more than the Due Process Clause required." *Id.* at 2138.

Justice Kennedy concurred in the judgment, joined by Justice Alito. *Id.* at 2139. Justice Kennedy noted that "absent an affirmative showing of bad faith on the part of the consular officer who denied Bereshak a visa – which Din has not plausibly alleged with sufficient particularity – *Mandel* instructs us not to 'look behind' the Government's exclusion of Berashk for additional factual details beyond what is its express reliance on § 1182(a)(3)(B) encompassed." *Id.* at 2141. Justice Kennedy further noted that the consular official was not required to point to a more specific provision within § 1182(a)(3)(B), as the statute expressly refrains from imposing such a requirement. *Id.* Thus, Justice Kennedy concluded that, even assuming Din had a protected liberty interest in her alien husband's visa application (which was not decided), "the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under § 1182(a)(3)(B). By requiring the government to provide more, the Court of Appeals erred." *Id.*

Though no opinion garnered majority support, Justice Kennedy's articulation controls the application of the doctrine of consular nonreviewability to a consular official's denial of a visa on § 1182(a)(3)(B) grounds. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016)

(adopting Justice Kennedy's concurrence and noting that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."); *see also Marks v. United States*, 430 U.S. 188 (1977). The *Din* plurality concluded that *any* explanation furnished by the government was more than due process required. Justice Kennedy's concurrence offered a narrower articulation: that the consular official's citation to the "terrorist activities" provision (§ 1182(a)(3)(B)) was sufficient and, absent a particularized allegation of bad faith, a court cannot look beyond that explanation. Justice Kennedy's articulation of the relevant standard necessarily has the approval of the plurality, which offered a broader standard. Thus, Justice Kennedy's articulation of the "facially legitimate and bona fide" standard is the only one garnering support of five justices, and is therefore binding precedent.

The facially legitimate and bona fide reason test has two components. To satisfy facial legitimacy, the consular officer must deny the visa under a "valid statute of inadmissibility." *Cardenas*, 826 F.3d at 1172 (9th Cir. 2016) (citing *Din*, 135 S. Ct. at 2140 (consular officer's citation to § 1182(a)(3)(B) "suffices to show that the denial rested on a determination that Din's husband did not satisfy the statute's requirements" and "the Government's decision to exclude an alien it determines does not satisfy one or more of [the statutory conditions for entry] is facially legitimate under *Mandel*")). To satisfy the "bona fide" requirement, the statute cited by the consular officer must "specif[y] discrete factual predicates the consular officer must find to exist before denying a visa" or there must be a fact in the record that "provides at least a facial connection to" the statutory ground of inadmissibility. *Id.*

**ii)**

Here, Latif, as an unadmitted nonresident alien, has no constitutional right of entry into this country. *Mandel*, 408 U.S. at 762. Even assuming that Farbod and/or Amiri have a constitutionally protected liberty interest implicated by the denial of Latif's visa,[3] the consular official satisfied any process that was due. "The U.S. Embassy in London issued a letter stating that Latif [had] been found ineligible to receive an immigrant visa under Section 212(a)(3)(B)[4] of the INA." Am. Compl. at ¶ 50. Under *Din*, this is a facially legitimate and bona fide reason to deny the application. *Din*, 135 S.Ct. at 2141. The Court cannot look beyond that reason without a particularized allegation of bad faith. Plaintiffs have made no such allegation here. Thus, the doctrine of consular non-reviewability mandates dismissal of this claim.

Plaintiffs make two primary arguments as to why their challenge to the visa denial should be allowed to proceed: 1) that the doctrine of consular nonreviewability is inapplicable,[5] and 2) that, even if it is applicable, Plaintiffs have alleged bad faith by the consular official.

**a.**

With respect to the first argument, Plaintiffs assert that "[t]he Defendants' reliance on *Kerry v. Din* is misplaced." Resp. at 4. Plaintiffs attempt to distinguish the facts of this case from *Kerry v. Din* by explaining that "A determination of inadmissibility based on INA § 212(a)(3)(B) is not made by a consular officer of the U.S. Department of State (DOS)." *Id.* Plaintiffs then

---

[3] In *Din*, the Court assumed without deciding that a citizen has a constitutionally protected liberty interest implicated by the denial of a visa to her non-citizen spouse. *Id.* at 2140. The Court found that there was no reason to decide whether she had a protected liberty interest, as due process was satisfied. Similarly here, it is unnecessary to decide whether Farbod (a citizen, and Latif's son) and/or Amiri (Latif's permanent resident wife) have a protected liberty interest.

[4] Codified at 8 U.S.C. § 1182(a)(3)(B).

[5] Plaintiffs also contend that the doctrine of consular nonreviewability is inapposite because Plaintiffs "are not asking the court to second guess a consular officer's determinations . . ." To the contrary, the amended complaint challenges the inadmissibility determination throughout, and specifically requests the Court to "Order the Defendants to provide the reason or an explanation of Latif's inadmissibility determination at a minimum in camera or in a summary" and to "Order Defendants DOS and DHS to process application if evidence is lacking or determinations are made in bad faith." Am. Compl. at 33.

engage in a lengthy exposition of the legislative allocation of authority over the visa processing system.[6] The main thesis of this exposition is that "INA 212(a)(3)(B) visa denials bear no resemblance to the traditional exercise of consular discretion because the real decision-making in these cases has in effect been ceded to the databases and watch listing process, in which government agents other than consular officers determine inadmissibility under INA§2[12](a)(3)(B). Therefore, the doctrine of consular nonreviewability is not applicable to this case." *Id.* at 7–8.

Even if Plaintiffs were correct that visa denials pursuant to INA 212(a)(3)(B) are *sui generis*, this does not in any way explain how *Din* can be distinguished from the instant case, because *Din* itself involved a visa denial under INA 212(a)(3)(B).[7] The unstated argument Plaintiffs are making is that the Supreme Court erred when it applied the doctrine of consular nonreviewability to visa denials under 212(a)(3)(B), as these particular types of visa denials involve no exercise of consular discretion. Irrespective of the wisdom of the *Din* decision, its holding is binding on this Court.

Plaintiff makes one meaningful attempt at distinguishing *Din*, noting that it was undisputed that the visa applicant in *Din* worked for the Taliban. Indeed, Justice Kennedy's concurrence explicitly recognized that Din admitted her husband worked for the Taliban. *Din*, 135 S.Ct. at 2141. Justice Kennedy further explained that the applicant's employment at the Taliban "even if itself insufficient to support exclusion, provides at least a facial connection to terrorist activity." *Id.* However, the Court did not impose a requirement that there must be a fact

---

[6] In their supplemental response, Plaintiffs also furnished "a copy of a visa in a passport as evidence of their argument that it is not the U.S. consulates that controls the issuance of a visa or other document of admission to the U.S. but rather, it is the Defendant Department of Homeland Security . . . that instructs the U.S. consulates if a visa or any other entry document should be issued to a non U.S. citizen to enter the United States." Mot. at PGID 303-304, ECF No. 30. For the same reasons provided herein, this additional document has no effect on the analysis.

[7] The *Din* opinion contains no reference to "INA 212(a)(3)(B)." The reason for this is that the Court chose to cite the corresponding provision in the U.S. Code, namely 8 U.S.C. § 1182(a)(3)(B).

in the record providing a facial connection to the statutory ground for inadmissibility. A court need not find such factual support in the record where the consular officer cited to a statutory provision that itself "specifies discrete factual predicates the consular officer must find to exist before denying a visa," such as § 1182(a)(3)(B). *Id.*; *Cardenas*, 826 F.3d at 1172 (noting that the consular officer must *either* "cite an admissibility statute that specifies discrete factual predicates the consular officer must find to exist before denying a visa *or* there must be a fact in the record that provides at least a facial connection to the statutory ground of inadmissibility") (emphasis added) (internal quotation marks omitted). The fact that the consular official cited to the statute implies that he found one of the discrete factual predicates existed in that particular case, thereby satisfying the "bona fide" requirement. *Cardenas*, 826 F. 3d at 1171.

The *Din* Court's discussion distinguishing the facts of *Mandel* is informative:

The Government's citation of § 1182(a)(3)(B) also indicates it relied upon a bona fide factual basis for denying a visa to Berashk. *Din claims due process requires she be provided with the facts underlying this determination, arguing Mandel required a similar factual basis. It is true the Attorney General there disclosed the facts motivating his decision to deny Dr. Mandel a waiver, and that the Court cited those facts as demonstrating "the Attorney General validly exercised the plenary power that Congress delegated to the Executive.". But unlike the waiver provision at issue in Mandel, which granted the Attorney General nearly unbridled discretion, § 1182(a)(3)(B) specifies discrete factual predicates the consular officer must find to exist before denying a visa.* Din, moreover, admits in her Complaint that Berashk worked for the Taliban government, which, even if itself insufficient to support exclusion, provides at least a facial connection to terrorist activity. Absent an affirmative showing of bad faith on the part of the consular officer who denied Berashk a visa—which Din has not plausibly alleged with sufficient particularity—Mandel instructs us not to look behind the Government's exclusion of Berashk for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed. The Government, furthermore, was not required, as Din claims, to point to a more specific provision within § 1182(a)(3)(B). *To be sure, the statutory provision the consular officer cited covers a broad range of conduct. And Din perhaps more easily could mount a challenge to her husband's visa denial if she knew the specific subsection on which the consular officer relied. Congress understood this problem, however. The statute generally requires the Government to provide an alien denied a visa with the "specific provision or provisions of law under which*

> the alien is inadmissible," § 1182(b)(1); but this notice requirement does not
> apply when, as in this case, a visa application is denied due to terrorism or
> national security concerns. § 1182(b)(3). Notably, the Government is not
> prohibited from offering more details when it sees fit, but the statute expressly
> refrains from requiring it to do so.

*Din*, 135 S. Ct. at 2140–41 (emphasis added) (internal quotations omitted). Thus, it is apparent that the additional factual detail contained in the record in *Din* (undisputed Taliban affiliation) was not necessary for the Court to reach its conclusion that due process was satisfied.

Notably, a recent decision from the Seventh Circuit provides some support for the argument that visa denials pursuant to § 1182(a)(3)(B) ought to be supported by additional factual details. In *Hazama*, the court found that the consular officer's denial of a visa application on § 1182(a)(3)(B) grounds was facially legitimate and bona fide where it was undisputed that the applicant had thrown rocks at Israeli soldiers when he was 13 years old. *Hazama v. Tillerson*, 851 F.3d 706, 709 (7th Cir. 2017). The court observed that "all we can do is to look at the face of the decision, see if the officer cited a proper ground under the statute, and ensure that no other applicable constitutional limitations are violated. Once that is done, *if the undisputed record includes facts that would support that ground, our task is over.*" *Id.* (emphasis added). To the extent *Hazama* can be read as requiring factual support in addition to the consular officer's citation to § 1182(a)(3)(B), this Court declines to adopt that requirement, as it is inconsistent with the express holding of *Din*. The interpretation provided by the Ninth Circuit in *Cardenas*, as set forth above, accords with the holding of *Din*.

Notably, after observing the undisputed fact that the applicant was employed with the Taliban, Justice Kennedy expressly refuted any notion that a consular official's decision must be supported by additional facts, such as Taliban affiliation. *Din*, 135 S. Ct. at 2141. Justice Kennedy noted that a Court may not "look behind" what the government's "express reliance on §

-18-

1182(a)(3)(B) encompassed." *Id.* He further stated that, although "the Government is not prohibited from offering more details when it sees fit" it is not required to do so, nor is it even required "to point to a more specific provision within § 1182(a)(3)(B)." *Id.* If the consular officer need not support his decision with additional factual details, it would be incongruous to say that a reviewing court must find additional factual details in the record to support the consular officer's decision.

In sum, *Din* is directly controlling here. Section 1182(a)(3)(B) is a valid inadmissability statute that establishes "specific criteria for determining terrorism related inadmissibility." *Din*, 135 S. Ct. at 2141. Thus, a citation to § 1182(a)(3)(B) is a facially legitimate reason to deny a visa application. *Id.* It is also a bona fide reason to deny a visa application, as § 1182(a)(3)(B) "specifies discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* The consular officer's citation to the statute implies that he found at least some of those discrete factual predicates existed in this case. *See id.*; *Cardenas* 826 F.3d at 1171. This is true notwithstanding the fact that § 1182(a)(3)(B) contains many subsections covering a "broad range of conduct." *Id.* Thus, the U.S. Embassy letter to Latif furnished a facially legitimate, bona fide reason for the visa denial by citing to § 1182(a)(3)(B). This Court cannot probe beyond that reason as Plaintiffs have made no particularized allegation of bad faith.

**b.**

Next, Plaintiffs argue that, if the doctrine of consular non-reviewability applies, they have made a particularized allegation of bad faith by the consular official. Plaintiffs contend "profiling based on imputed religion and/or national origin is prohibited by U.S. law and clearly shows bad faith." Resp. at 15. Assuming that this allegation constitutes a particularized allegation of bad

faith,[8] Plaintiffs still do not allege bad faith *on the part of the consular official*, but rather allege that the profiling occurred by the agencies responsible for the watch list.

The amended complaint avers: "The Unidentified FBI Agents are responsible for providing information to the TSC and the TECS which result in the inadmissibility determinations and designations as national security threats." Am. Compl. at ¶ 24. The amended complaint further avers: "The inadmissibility determination by Defendants discriminates against Plaintiffs *because it is based on TECS, TSD[B] and other systems which contained the unsubstantiated information based on the Plaintiffs' imputed religious beliefs – Islam.*" *Id.* at ¶ 69 (emphasis added). Finally, Plaintiffs allege that "Security checks are conducted and if any negative information is found, the person is determined to be inadmissible and the U.S. Consulate will request that the applicant file a waiver. No waiver exists for any of the terrorism grounds of inadmissibility." *Id.* at 57.

Thus, Plaintiffs contend the data contained in the TSDB, TECS, and related databases are compiled in bad faith. They contend they are listed in these databases not due to any connection to terrorist activity, but solely due to profiling based on their national origin and imputed religion. However, this is not an allegation of bad faith by the consular official, but an attack on the reliability of the information consular officials are required to draw upon in making their determinations. Indeed, Plaintiffs allege that the consular official exercises no discretion of his own, but merely runs a security check and issues a denial if any negative information is found in a database.

In sum, the allegations, accepted as true, compel the conclusion that the consular official did not act in bad faith, but did precisely what was directed by his job duties and the applicable

---

[8] Notably, *Din* furnishes no guidance on what such an allegation would look like.

law. Accordingly, there is no basis for the court to probe past the reason offered by the official. The reason that he provided satisfied due process. The Court cannot order the official to provide a more detailed explanation for the visa denial (to review in camera or otherwise), nor can the Court reverse the decision, or engage in any further review of Plaintiffs challenges to the inadmissibility determination by the U.S. Embassy and the denial of Latif's visa. Accordingly, the complaint will be dismissed as to those challenges.

**B.**

Plaintiffs also allege that they are listed in the TECS database and the Terrorist Screening Database (TSDB or TSD). Am. Compl. at 26, 43, 69. They contend that the TECS designation has no basis in fact linking them to terrorism, is based solely on their national origin and imputed religious belief, and that they were given no notice of the reason for the designation or an opportunity to contest the factual basis behind it. *Id.* at 68, 69, 77, 84–86, 95, 101. As a result, they claim that Defendants have violated their first amendment rights under the free exercise and establishment clauses (count 1); and their fifth amendment rights to equal protection, procedural due process, international travel, and familial association (counts 2, 3, 4, 10). They also assert violations of the INA (counts 6 and 7), APA (count 8), and the prohibition on Bills of Attainder (count 5). Plaintiffs ask the Court to order Defendants to furnish an explanation for the TECS designation and the identity of the agency and individual responsible for the TECS designation. *Id.* at 33. They also seek actual damages, punitive damages, and attorney fees.

Notably, Defendants direct very little attention to Plaintiffs' challenge to their placement in the TECS database and TSDB. It is apparent that Defendants do not regard that challenge as distinct from Plaintiffs' challenge to the visa denial. Rather, Defendants view the challenge to the

TECS designation as an attempt to circumvent the doctrine of consular nonreviewability. Mot. Dismiss at 14.

In short, Defendants identify no reason why the doctrine of consular nonreviewability should compel dismissal of the claims challenging the TECS designation. As a practical matter, the motivation behind the challenge to the TECS designation may well be an attempt at an end run around the doctrine of consular nonreviewability. However, Plaintiffs' subjective motivations are not at issue.

The motion to dismiss offers three additional bases for dismissal other than consular non-reviewability. Some of these bases are sufficient to warrant dismissal of certain counts, whereas others will require supplemental briefing.

**i)**

First, Defendants argue Plaintiffs lack standing to challenge the visa refusal. "The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). First, Plaintiff must have suffered an injury in fact – an "invasion of a legally protected interest" which is "concrete and particularized" and not "conjectural or hypothetical." *Id.* at 561. Second, the injury must be fairly traceable to the conduct complained of. *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Defendants argue Latif lacks standing because "as an unadmitted, nonresident alien, Mr. Latif has no constitutional right to enter the country." *Id.* at 15. They argue that Amiri and Farbod lack standing because the denial of a visa to a relative does not implicate a constitutionally protected liberty interest. Notably, Defendants do not explicitly address any of

the three standing requirements set forth in *Lujan*, though they implicitly argue that injury in fact is lacking, as a visa denial deprives Plaintiffs of no constitutionally protected interest.

Furthermore, Defendants focus solely on whether the Plaintiffs have standing to challenge the visa denial, without addressing whether they have standing to challenge their inclusion on a terrorist database. The latter question has been explored in this circuit fairly recently. *See Shearson v. Holder*, 725 F.3d 588, 591 (6th Cir. 2013) (finding that citizen had standing to raise fifth amendment procedural due process challenge to her designation on the TSDB where she was detained by CBP officials at a port of entry, but holding that citizen failed to exhaust administrative remedies by failing to avail herself of DHS's Traveler Redress Inquiry Program (TRIP)).

The Ninth Circuit has also explored this question in the context of an alien's challenge to her inclusion on the No-Fly list where her visa application was also denied. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983 (9th Cir. 2012). The court noted that "the government mischaracterizes Ibrahim's injury by focusing solely on her inability to return to the United States." *Id.* at 993. The court further explained that Ibrahim suffered distinct injuries due to her presence on the No-Fly list: "The no Fly-List prevents her from boarding any U.S. carrier whether or not a flight departs from or lands in the United States. It also prevents her from flying over U.S. airspace. These injuries are unrelated to her lack of a visa." *Id.*

The court also noted that:

> Even if Ibrahim's injury were limited to her inability to enter the United States, she would still have standing. Ibrahim does not challenge the revocation of her visa, as decisions of consular officers to deny a visa are immune from judicial review. But it is a reasonable inference that removal of her name from government watchlists would make a grant of a visa more likely. If Ibrahim's name were removed from the TSDB, and thereby removed from the Consular Lookout and Support System, the State Department would be likely to grant her a visa, given that it has relied on her alleged connection to terrorism as the basis for

revoking her visa and denying her application for a new one. Though Ibrahim's future ability to obtain a visa is uncertain and we would be powerless to review a denial, plaintiff need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision . . . Plaintiffs must show only that a favorable decision is *likely* to redress their injuries, not that a favorable decision *will inevitably* redress their injuries . . . As the district court correctly observed, while obtaining a visa may stand as a potential obstacle to her entry into the United states, it does not completely foreclose redressibility. Ibrahim is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time.

*Id.* (internal quotations omitted) (emphasis in original).

As the parties have not yet addressed this issue, supplemental briefing will be directed.

### ii)

Defendants' argument that Latif lacks standing also raises a related but distinct question, namely whether Latif has a right to sue. That is, whether Latif, as an unadmitted non-resident alien, has a right to assert constitutional or statutory claims. However, Defendants only addressed whether Latif has a constitutional right to enter the U.S. They did not address whether he may assert a constitutional or statutory challenge to his designation on a terrorist watchlist, irrespective of his right to enter the U.S.

While it is well established that aliens legally within the United States may challenge the constitutionality of federal and state actions, the right of a non-resident alien to do so is less clear. The Supreme Court has gradually developed a framework for addressing this issue. In *Eisentrager*, the Court noted that an alien "is accorded a generous and ascending scale of rights as he increases his identity with our society." *Johnson v. Eisentrager*, 339 U.S. 763 (1950). In *Boumediene*, the Court stated that an alien's right to assert constitutional claims is based on "objective factors and practical concerns" and not based on formalism. *Boumediene v. Bush*, 553 U.S. 723 (2008).

In *Verdugo*, the Court stated that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); *see also Ibrahim*, 669 F.3d 983 at 997 (holding that alien had established a "significant voluntary connection" with the U.S. for the purpose of asserting constitutional claims where she spent four years at Stanford University pursuing a Ph.D and voluntarily departed to attend a conference with the intention of returning to the U.S. afterward).

As the parties have not yet addressed this issue, supplemental briefing will be directed.

### iii)

Lastly, Defendants address the specific counts of the complaint, arguing that they do not state claims for relief. A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678-79 (quotations and citation omitted).

Plaintiffs have failed to state a claim for a violation of the establishment clause of the first amendment, as they have identified no government action with a non-secular purpose that has a principal effect of advancing or inhibiting religion, or that results in excessive government entanglement with religion. *See Harkness v. Sec'y of Navy*, 858 F.3d 437, 447 (6th Cir. 2017) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)). Plaintiffs also fail to state a claim under the free exercise clause. They do not allege that they have been compelled to engage in a practice that violates their religious convictions, refrain from doing an act required by their religious convictions, or affirm or deny a belief contrary to their religious convictions. Indeed, Plaintiffs do not claim to be Muslim, but rather accuse Defendants of presuming they are Muslim. Am. Compl. at ¶ 68–70. Accordingly, count 1 will be dismissed.

Plaintiffs also fail to state an equal protection claim as they fail to allege that they have been treated differently than similarly situated individuals of a different nationality. For instance, Plaintiffs make no allegation that the government only maintains records on Iranian nationals. Nor do they allege that they are treated differently based on their religion, as they do not claim to be Muslim. Accordingly, count 2 will be dismissed.

Plaintiffs have failed to state a claim for a violation of the Article I section 9 prohibition on bills of attainder as they do not identify any legislative act that "determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Zilich v. Longo*, 34 F.3d 359, 362 (6th Cir. 1994). Accordingly, count 5 will be dismissed.

Plaintiffs have partially withdrawn count 9, which asserts violations of the "confrontation clause of the fifth and sixth amendment." They have withdrawn their sixth amendment confrontation clause claim, but maintain that the due process clause of the Fifth Amendment gives them a right to confront the evidence against them. Resp. at 22. The latter claim is entirely

duplicative of count 3, and is not a confrontation clause claim. Thus, count 9 will be dismissed in its entirety.

Plaintiffs fail to state a claim for a violation of the INA because the only violations alleged relate to the denial of Latif's visa application, which will be dismissed for the reasons stated above. To the extent count 7 can be read as alleging that the TECS designation violates the INA, count 7 still fails to state a claim. Count 7 merely identifies a purported legislative purpose of the INA, namely family unity, and argues that Defendants have not acted in furtherance of that legislative purpose. Accordingly, counts 6 and 7 will be dismissed.

The parties have not adequately briefed whether counts 3 (procedural due process), 4 (right to travel), 8 (APA) and 10 (right to familial association) state a claim for relief in light of the challenge to the TECS designation, but rather focus on the visa denial.

Accordingly, supplemental briefing will be directed. The supplemental briefing should address, at a minimum, 1) whether Plaintiffs have standing to challenge Amiri and Latif's alleged inclusion on the TECS database and the TSDB and to seek an explanation for the designation, 2) whether Plaintiff Latif, as an unadmitted non-resident alien, has a right to assert a constitutional or statutory challenge to his alleged inclusion on the TECS database and TSDB and seek an explanation for the designation, 3) whether Plaintiffs have stated a claim for relief under counts 3, 4, 8 and 10, and 4) whether Plaintiffs were required to exhaust administrative remedies by availing themselves of the DHS Traveler Redress Inquiry Program (TRIP) prior to initiating this case (*See Shearson v. Holder*, 725 F.3d 588, 591 (6th Cir. 2013) (holding that citizen failed to exhaust administrative remedies by failing to avail herself of DHS's Traveler Redress Inquiry Program (TRIP)); *but see Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) (holding citizen was not required to administratively exhaust his claims)).

**IV.**

Accordingly, it is **ORDERED** that Defendants' motion to dismiss, ECF No. 20, is **GRANTED** in part, as to all aspects of the amended complaint that challenge the inadmissibility determination and denial of Latif's visa, and as to counts 1, 2, 5, 6, 7, and 9 in their entirety.

It is further **ORDERED** that counts 1, 2, 5, 6, 7, and 9 are **DISMISSED** in their entirety.

It is further **ORDERED** that Defendants are **DIRECTED** to file a supplemental brief in support of the motion to dismiss by **February 28, 2018.**

It is further **ORDERED** that Plaintiffs are **DIRECTED** to file a supplemental response by **March 14, 2018**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 30, 2018


PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 30, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager